No reasonable person could have reached the decision rendered by the Board of Immigration Appeals based upon the evidence in the record. The errors by the BIA are profound and disturbing and, in our opinion, compel this Court to reverse that decision and grant asylum from Ethiopia with a finding that is a matter of discretion, that the petitioner should not be removed to Eritrea. The errors that we will focus on are as follows. One, the BIA ignored the findings of the immigration judge finding him both a citizen and national of Ethiopia and arbitrarily required the petitioner to establish a well-founded fear of persecution in both Ethiopia and Eritrea. Two, the BIA misapplied this Court's holding in Galei VNS in two respects. One, from distinguishing reliance on one fragment of a U.S. Department of State report, ignoring not only the rest of the report and the context, but the other evidence in the record. The other mistakes are characterizations of the testimony which have no basis in fact. In all, beyond these specific issues is a disturbing mechanical blindness to the human being. Counsel, are you advocating a claim of torture? No. Okay, so that part of the case falls out. By what standard do we review the BIA's findings? Substantial evidence standard, whether a reasonable person could reach that decision and whether an alternative decision is compelled. Do you consider that to be deferential? Yes. Why do you say we must? Well, number one, as a matter of law, they incorrectly stated that he had to demonstrate both persecution from Ethiopia and Eritrea. Eritrea was properly considered as a discretionary issue with respect to whether as a country that he could be removed to or if he was, if relief was denied from Ethiopia as a third country for deportation and removal. Where was he ordered, which country was he ordered to be deported to? Ethiopia and Eritrea. Well, it wasn't clear, but it was both Ethiopia or Eritrea. One or the other? Right. And are there different conditions in the two countries which would cause him different types of persecution? Yes. Due to his mixed ethnicity? Yes. Yes, Your Honor. So what are those? Okay. In Ethiopia, as of, and remember, all they based this was a fragment, was the State Department report, and none of the other evidence on the record. But that State Department report for Ethiopia indicates, number one, that another 1,200 male Eritreans and Ethiopians of Eritrean origin were still being held in internment camps at the DESA year-end. That's EOR 227. Secondly, that's reiterated, again, at 232. Now, is that considered persecution under our current law, being held in internment camps? These individuals were arrested because of their Eritrean origin. Yes, I consider arrest. Well, that's the on account of? Yes. Now, being held in internment camps, is that considered persecution? Cumulatively based on that and other factors of severe government-sponsored economic types of persecution that occurred, and in light of the fact that his sister had been arrested and disappeared. So that's his individualized persecution, his sister's arrest? Yes. I think there's a Seventh Circuit decision where, I think it's Judge Posner comes very close to talking about the generalized kind of internment in camps and all of that rising to the level of persecution, but is there a Ninth Circuit case on that? There are a number of cases that talk about the cumulative effects. We would argue that the arrest, combined with the economic restrictions and the denial of nationality, constitute a form of acute persecution. I would bring your attention to the decision in Al-Hamri, which talks about a very similar situation involving Palestinians in Kuwait in the aftermath of a much more acute ethnic cleansing. And this court took into consideration that there had been a horrific ethnic cleansing that had occurred, and that less acute forms of persecution were occurring, primarily economic. And they recognized that there had actually been a new constitutional government in power. Here, we have 1,200 ethnic Eritreans, and Ethiopians of Eritrean ethnicity still in jail. We have no change in government whatsoever. We have the nationality issue unresolved, and evidence from the State Department report they relied on indicating that Ethiopians of Eritrean ethnicity can't vote, and if they leave, they can't come back. As of the date of the hearing and the evidence that's on the record, there's no possible way that you could find that cumulatively, particularly in light of the recent decision in Al-Hamri, that this didn't constitute an acute form of persecution, cumulatively. And I would also take note of the fact that this event had just, all they focused on was one fragment of the State Department report. There is not one statement in that State Department report indicating that it is now safe to return for ethnic Eritreans. All it indicates is that they can't return and that their nationality is in question. And they ignore, I can continue with other excerpts from the State Department report. Well, what excerpts from the State Department report support your position? I already indicated the two sites to 1,200 civilian residents of Eritrean origin remain detained in internment camps. That's EOIR 232. Third, in addition, this is at 232 as well, the issue of the nationality of Eritrean origin Ethiopians has not been settled. Fourthly, during the conflict with Eritrea, and this is at 234, Eritrean and Ethiopians of Eritrea have lost their jobs, businesses, licenses, and access to government services, including healthcare facilities, and many were deported without due process. There's no indication that there was any change in that. They indicated there's a change supposedly in the cessation of deportation. So you would assume that if there was a change in that, that they would indicate that. The State Department report also says that things have changed since the cessation of hostilities between Ethiopia and Eritrea in June. I don't know if it says June of what year. Of 2000. The only change that they refer to is the cessation of deportations, which the other evidence in the record showed was actually incorrect, in which the court and the BIA did not consider. In Galei V. INS, and aside from distinguishing state-sponsored from private forms of economic persecution, there was another focus, and that was on the correct appropriation of the appropriate evidence that the court is supposed to look at with the U.S. Department of State report. Galei specifically stated that it was while the IJ erred in not considering other documents that were submitted, that the BIA had cured that error by specifically looking and citing in their decision the other documents that they rested on. If you look at the decision by the BIA, there is no reference whatsoever to any of the other evidence submitted in the BIA, which not only showed that the deportations did in fact continue, but that other forms of problems were occurring, that the nationality issue was not resolved, and essentially that there was a ceasefire and that one acute aspect clearly did improve, but not the overall situation. And that is another fatal mistake. The BIA is relying on a decision in Galei which, if you look at that decision, compels the opposite result because of the extreme forms of economic persecution that the BIA even cite in their decision, saying that they don't rise. And secondly, in their complete ignorance, it's almost a conscious decision not to cite any of the other evidence and to simply take one fragment of a State Department report and use that as a proposition which has no basis. So in other words, the BIA blindly mechanically took one piece of a State Department report without looking at the context of the report itself, which would show that that wasn't supported by the other parts of that same report, and in no way looked at any of the other evidence which we have cited in our brief which showed that problems continued. And philosophically and from public policy point of view, and I assume that was taken into consideration in El Hamra, but I don't think that that was taken into consideration in El Hamra. And thirdly, after an extreme form of ethnic cleansing that occurred, human nature and understanding human societies, there's a common-sense understanding that the situation isn't going to magically improve and that problems are going to arise and that there's going to be additional deference to victims of ethnic cleansing because of an inherent understanding that ethnic cleansing necessarily means deep-seated forms of persecution. That's all. Good morning. May it please the Court. I'm Jafrika Lee from the Department of Justice. Here on behalf of the Respondent, the Attorney General. The Board's determination that the Petitioner failed to establish a well-founded fear of future persecution in Ethiopia is supported by substantial record evidence which this Court must defer to. The BIA's decision should be sustained unless the Court finds that there was evidence in the record that was so compelling that no could have found that he did not have a well-founded fear of persecution. Counsel, how do you distinguish the El Hamra case where the Court said that when persecution of a group of people is widespread within a country, an alien may establish an objectively reasonable fear of future persecution in that country by showing that as a member of that group, he or she has a heightened risk of persecution, and in case of an alien, he or she has a heightened risk of persecution? Well, I would distinguish that case by saying that here, though there is evidence in the State Department report that there were continued abuses of human rights, but then the situation had started to improve, and there were cases where there were cases where, after the cessation of hostilities agreement was signed, that the Petitioner here still has the burden of proof of establishing that he has some kind of tie or connection to these types of abuse that are going on with members of the group that he's talking about. And he does not challenge the board's decision that he did not suffer past persecution. He's trying to establish that he has a reasonable or well-founded fear of future persecution. Now, he never, he did not testify to any specific direct evidence of attacks against him. He did not testify to any specific direct evidence of attacks on him or any kind of threats or any... He testified that he was told that his sister was arrested because of her mixed ethnicity, and that he had gone into hiding and left the country out of caution. However, his testimony was not specific in any instances of any other types of mistreatment or abuse. Actually, he testified that life was good in Ethiopia until the outbreak of the war, and he said things got worse, but he gave no specific examples of how life got worse for him in Ethiopia, and just said that he came home one day and his sister was missing, and he was told that she had been arrested because of her mixed ethnicity. Now, in his brief on appeal, on appeal to this court, the petitioner makes an elaborate argument concerning the other mistreatment of Eritreans or Ethiopians of Eritrean origin, and tries to establish a pattern of practice. And he, to a lesser degree, made these arguments before the immigration judge and before the board, and actually presented no evidence of any kind of direct economic mistreatment that he himself suffered. Actually, he was only a 17-year-old at the time, and he didn't have a job. He hadn't worked, though. But does that mean that he doesn't have, I mean, at the time when he left, he wouldn't have been able to grow a business and have it taken away or gotten a license and everything? No, but he could have presented, he could have testified as to other similarly situated people that are his, you know, the family members. He could have said something about, he said nothing about his life, really, about his sister's life there before she was killed, and that, you know, if there was anything that he could have pointed to that his other family members or other people that he knew even, that they were suffering any of this mistreatment. He just gives conclusory statements about what the conditions were. But the State Department report doesn't give conclusory statements. I mean, it's true that the, I guess, the war stopped until 2000, but the State Department report then goes on to talk about all these other deprivations, you know, not being able to do business, not having any citizenship, not having any rights, 1,200 people still in the internment camp, that the group continues to suffer. And it's sort of a balancing test that the greater the generalized persecution is shown, it's right in the State Department report, the lesser the individual petitioner needs to show. Right? Right. But in context, if you do read the State Department report, it's basically reporting on these 1,200 people who had been, who were in internment camps, were people who had been arrested or detained while the war was still going on. And at the end of the year, it would be surprising if in that short period of time from when there actually was, had been the cessation of hostilities agreement, that you would actually see an immediate change, drastic change. But the report is significant in detailing that the government, the Ethiopian government, had stopped deporting Ethiopians and Ethiopians of Eritrean origin at that time. Though there might have been some isolated incidents where there were continued deportions, but the government itself had stopped doing that. And that is substantial evidence to support the board's... I wish we had a more recent country conditions report in the record. I'm sorry? I said it would be helpful to have a more recent... It would, but of course we're bound by the report that is in this record. I would point out, however, the Seventh Circuit in the Medhin case that cited in our brief that they referred to a country report from the year 2002 where they had concluded that the deportations had stopped and that the conditions had improved in the country. And also I would like to address a point that opposing counsel made concerning the country that the petitioner was ordered deported to. And his statement that the board required that the petitioner show that he had to have a well-founded fear of deportation in either Eritrea or Ethiopia. The country that he was ordered deported to was Ethiopia, and the reason that the discussion... Actually, the board's order, it actually doesn't have it, a box check that doesn't actually say which country that he was being deported to, but he was charged as an Ethiopian, and he claimed to be a native and settled in Ethiopia. And he claimed to be a citizen of Ethiopia. The reason that the evidence was introduced concerning Eritrea was because of petitioner's claim that he... The reason, the whole reason that he feared going back to Ethiopia was that he would be deported to Eritrea and that once he got to Eritrea, he might be deported again because he wouldn't be considered either Ethiopian or Eritrean. And so the board looked at the country report from Eritrea and said, well, if that did happen, it appears that he would have been accepted in Eritrea because they would consider the fact that his father was Eritrean, that they would consider that fact and consider him to be Eritrean as well. All right. Does anyone have any questions? Thank you, counsel.
judges: Beezer, Hall, Wardlaw